1   SHAND S. STEPHENS (Bar No. 67694)
    shand.stephens@dlapiper.com
2   AMANDA L. MORGAN (Bar No. 246277)
    amanda.morgan@dlapiper.com
3   JEANETTE T. BARZELAY (Bar No. 261780)
    jeanette.barzelay@dlapiper.com
4   **DLA PIPER LLP (US)**
    555 Mission Street, Suite 2400
5   San Francisco, California 94105
    Telephone: (415) 836-2500
6   Facsimile: (415) 836-2501

7   TRAVIS R. WALL (SBN 191662)
    twall@mail.hinshawlaw.com
8   HINSHAW & CULBERTSON LLP
    One California Street, 18th Floor
9   San Francisco, CA 94111
    Telephone: (415) 362-6000
10  Facsimile: (415) 834-9070

11  SPENCER Y. KOOK (SBN 205304)
    skook@mail.hinshawlaw.com
12  HINSHAW & CULBERTSON LLP
    633 West 5th Street, 47th Floor
13  Los Angeles, CA 90071
    Telephone: (213) 680-2800
14  Facsimile: (213) 614-7399

15  Attorneys for Defendants Applied Underwriters, Inc., Applied
    Underwriters Captive Risk Assurance Company, Inc.,
16  California Insurance Company, and Applied Risk Services

17

18                  **IN THE UNITED STATES DISTRICT COURT**

19              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

20  PET FOOD EXPRESS LTD., et al.,          Case No. 2:16-01211-WBS-AC

21                Plaintiffs,                Judge William B. Shubb
                                            Magistrate Judge Allison Claire
22  v.

23  APPLIED UNDERWRITERS, INC.,            **MEMORANDUM OF POINTS AND**
    et al.,                                 **AUTHORITIES IN SUPPORT OF**
24                Defendants.               **DEFENDANTS' MOTION FOR SUMMARY**
                                            **JUDGMENT**
25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

                                    -1-

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................. 3

   A.   The Program's Features and Operation................................................. 3

   B.   The CDI Has Approved the Sale of an Amended RPA, Which Has Substantially the Same Features and Operates in the Same Manner as Pet Food's RPA ......................................................................................... 5

   C.   The Program Worked As Designed and Disclosed to Pet Food ........................... 6

      1.   Pet Food Is a Sophisticated, Knowledgeable Consumer of Workers' Compensation Insurance ..................................................... 6

      2.   Pet Food Extensively Reviewed the Program Materials Before Purchase and Relied on Its Experienced Broker ........................................ 7

      3.   Pet Food Admits It Misunderstood How Rebates Would Be Distributed, Negating Any Actual Loss of Money or Property ................. 9

      4.   Pet Food Renewed the Program for a Seventh Year Despite Having Read Published Complaints About the Program, Indicating Its Understanding and Acceptance.............................................................. 11

      5.   Pet Food Performed Well Under the Program Under Any Metric........... 12

      6.   Pet Food Has No Witness Who Can Quantify Its Monetary Loss and Restitution ....................................................................................... 13

III. ARGUMENT ............................................................................................... 14

   A.   Pet Food's UCL Claim Must Fail Because the Undisputed Evidence Shows That Pet Food Suffered No Harm As a Result of Defendants' Conduct ............. 16

      1.   Pet Food's UCL Claim Must Fail Because Pet Food Has Not Suffered Injury in Fact ............................................................................ 16

      2.   Pet Food's UCL Claim Must Fail Because, Under the Facts of This Case, No Conduct by Defendants Could Have Caused Pet Food's "Harm" ................................................................................................... 19

   B.   Pet Food's Quasi-Contract Claim Must Also Fail Because Pet Food Cannot Show Actual Harm or Injury in Fact................................................................. 22

   C.   Pet Food's Quasi-Contract Claim Fails for the Additional Reason That Pet Food Lacks Standing to Enforce the Insurance Code and Related Regulations.......................................................................................................... 22

IV. CONCLUSION ............................................................................................ 27

-i-

DLA Piper LLP (US)
San Francisco

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-cv-00158-WBC AC; 2:16-01211 WBS AC

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................14

*Arriaga v. Loma Linda University*,
   10 Cal. App. 4th 1556 (1992), *superseded by statute on other grounds* ............................23, 24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988) ...........................................14, 15, 27

*Crusader Ins. Co. v. Scottsdale Ins. Co.*,
   54 Cal. App. 4th 121 (1997)...........................................................................23, 24, 26

*Delbon Radiology v. Turlock Diagnostic Ctr.*,
   839 F. Supp. 1388 (E.D. Cal. 1993)......................................................................15

*Edwards v. Aguillard*,
   482 U.S. 578 (1987) ............................................................................................15

*Estate of Gonzales v. Hickman*,
   No. ED CV 05-660 MMM, 2007 WL 3237727 (C.D. Cal. May 30, 2007)..........................14

*Farmers Ins. Exchange v. Super. Ct.*,
   137 Cal. App. 4th 842 (2006)...........................................................................23, 25, 26

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   119 F.R.D. 344 (S.D.N.Y. 1988) ...........................................................................20

*Hall v. Time Inc.*,
   158 Cal. App. 4th 847 (2008)...............................................................................16

*In re Safeguard Scientifics*,
   216 F.R.D. 577 (E.D. Penn. 2003)..........................................................................20

*Martinez v. Welk Grp., Inc.*,
   907 F. Supp. 2d 1123 (S.D. Cal. 2012) ..............................................................16, 18

*Matter of Placid Oil Co.*,
   932 F.2d 394 (5th Cir. 1991)...............................................................................15

*MH Pillars Ltd. v. Realini*,
   277 F. Supp. 3d 1077 (N.D. Cal. 2017) ..................................................................21

*Middlesex Ins. Co. v. Mann*,
   124 Cal. App. 3d 558 (1981)...............................................................................23

*Miller v. Glenn Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006)........................................................................15

*Moradi-Shalal v. Fireman's Fund Ins. Cos.*,
    46 Cal. 3d 287 (1988) .....................................................................23, 25, 26

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008)................................................................22, 24

*Princess Cruise Lines, Ltd. v. Superior Court*,
    179 Cal. App. 4th 36 (2009)..........................................................................20

STATUTES

Cal. Bus. & Prof. Code § 17200, *et seq.* ...........................................................1

Cal. Ins. Code § 790.03 ...................................................................................26

Cal. Ins. Code § 1011(e) ..................................................................................24

Cal. Ins. Code § 1065.5 ...................................................................................24

Cal. Ins. Code § 1605.1 ...................................................................................24

Cal. Ins. Code § 1605.3 ...................................................................................24

Cal. Ins. Code § 11650, *et seq.*.......................................................................25

Cal. Ins. Code § 11658 ............................................................................. passim

Cal. Ins. Code § 11730, *et seq.*.......................................................................25

Cal. Ins. Code § 11735 .................................................................22, 23, 24, 26

Cal. Ins. Code § 11737(d) ................................................................................25

Cal. Ins. Code § 12921.1 ..................................................................................24

Cal. Ins. Code § 12924 .....................................................................................24

Cal. Lab. Code § 3700.......................................................................................18

OTHER AUTHORITIES

10 Cal. Code Regs. § 2218.........................................................................22, 23

10 Cal. Code Regs. § 2268....................................................................22, 23, 24

10 Cal. Code Regs. § 2591.1..............................................................................24

CA B. An., A.B. 1753 Sen., 8/31/1995..............................................................26

DLA PIPER LLP (US)
SAN FRANCISCO

-iii-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

Fed. R. Civ. P. 56 ................................................................................................................15, 27

Fed. R. Civ. P. 56(c) ..................................................................................................................14

U.S. Constitution Art. III ...........................................................................................................16

DLA Piper LLP (US)
San Francisco

-iv-
POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

## I.      INTRODUCTION

Plaintiff Pet Food Express Ltd. ("Pet Food") filed this lawsuit in 2016 against Defendants Applied Underwriters, Inc., Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"), California Insurance Company ("CIC"), and Applied Risk Services ("ARS") (collectively, "Defendants"), generally alleging that Defendants fraudulently marketed and sold a workers' compensation insurance program known as EquityComp® (the "Program") to Pet Food and other similarly situated California employers in violation of California and federal law. The complaint alleged claims for federal RICO violation, unfair competition (Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")), and unjust enrichment. *See generally* Second Am. Class Action Compl., Dkt. 54.[1] The Court dismissed the RICO claim at the pleading stage. As a result, the only claims remaining for trial are Pet Food's claims for unfair competition and unjust enrichment/quasi-contract.

Pet Food's core theory is that the Program was unlawful and unfair because one of the Program documents—the Reinsurance Participation Agreement ("RPA")—was not filed with or approved by the California Department of Insurance ("CDI"). Pet Food relies on the June 20, 2016 decision of the California Insurance Commissioner ("Commissioner") in the administrative appeal *In the Matter of the Appeal of Shasta Linen Supply, Inc.* (the "*Shasta* Order"), which held (erroneously) that the RPA between Defendants and Shasta was void and unenforceable. This Court has already ruled that the *Shasta* Order "does not control this court" and declared its "disagree[ment] with the Commissioner" and his finding that the RPA was unlawful simply because it was not filed. *See, e.g.*, Oct. 17, 2017 Order, Shasta Dkt. 66 ("MTD Order") at 21. This Court instead held that "an unfiled rate is not unlawful per se." *Id.* And in dismissing Pet Food's RICO claims, the Court also held that Defendants "disclosed in program documents that the RPA

---

[1] Pet Food brought its action along with two other plaintiffs and, acting in concert, sought to have this group of plaintiffs represent a class of all purchasers of the Program in California. The Court denied both their motion for class certification and motion for leave to file a renewed class certification motion. *See generally* Mem. & Order Re: Defs.' Mot. To Dismiss, Dkt. 65; Mem. & Order Denying Plfs.' Mot. For Class Certification, Dkt. 116; Order Denying Plf. Alpha Polishing's Motion for Leave to File Renewed Mot. For Class Certification, Dkt. 128. Where relevant, Defendants cite to documents from the action of one of Pet Food's co-plaintiffs, Shasta Linen Supply, Inc., as "Shasta Dkt."

was not a filed retrospective rating plan, and detailed how the profit sharing program would work." *Id.* at 12; Defendants' Separate Statement of Undisputed Material Facts ("SUMF") at No. 1.

As explained further below, Pet Food's remaining claims cannot survive this Motion because, among others things, Pet Food cannot show the necessary injury in fact or causation to support its claims, for multiple reasons:

- Pet Food admitted it performed *better* under the supposedly unlawful RPA than it would have under the CDI-approved guaranteed cost policies ("CIC Policies") (SUMF at No. 2);

- Before renewing the Program for a second time, Pet Food conducted an investigation of the Program through its general counsel, John Moore, who concluded that "the plan had worked differently than represented to [Pet Food] in the Applied marketing materials, and that it would be unconscionable under California law for Applied to enforce the EquityComp RPA." (SUMF at No. 3.) Pet Food renewed the Program despite this;

- Pet Food also consulted advisors and read articles discussing alleged issues with the Program (similar to the claims Pet Food asserts in this lawsuit), yet decided to continue in the Program for a seventh year because it "knew exactly what we were getting into" and "it was [Pet Food's] . . . best option at the time" (SUMF at No. 4);

- Pet Food has not disclosed any expert witness or other witness who can quantify Pet Food's supposed harm and establish its right to restitution, even assuming it could prove liability on any theory;

- Pet Food participated in the Program for a total of *seven* years, executing not one but two RPAs, plus an extension agreement, indicating its satisfaction with and understanding of the Program;

- Pet Food reviewed the Program materials extensively before deciding to purchase and relied on its sophisticated insurance broker, who was very familiar with the Program and had presented it to participants and prospective participants around 40 times;

/////

DLA PIPER LLP (US)
SAN FRANCISCO

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

- Pet Food testified that the primary basis for its alleged injury was Defendants' failure to pay rebates in accordance with Pet Food's understanding about the timing of those refunds under the Program, but admitted that the information was "in the contract" and that Pet Food simply "did not pick up on it," that Pet Food's misunderstanding came from conversations with its broker (not Applied), and that Pet Food had, in fact, received rebates all along throughout the Program;

- Pet Food got the benefit of its bargain in purchasing a loss sensitive program that provided it with the opportunity of lower ultimate costs if it could maintain a safe workplace and keep its workers' compensation claims low, but Pet Food's workers' compensation claims over its seven years in the Program were considerably higher on average than its previous average annual costs, resulting in higher than expected costs;

- Pet Food's total Program cost was less than the maximum costs it was quoted (adjusted for payroll increases), and comparable to or *less than* the other workers' compensation insurance programs it was quoted (SUMF at No. 5).

All of these facts, among others, demonstrate that Pet Food cannot present any evidence of injury or causation at trial even if it could establish liability, and they demonstrate the absence of any harm to Pet Food for which Defendants can be found liable.

## II.    STATEMENT OF FACTS

### A.    The Program's Features and Operation

The Program is a three-year loss-sensitive workers' compensation program consisting of two main components: (1) the CIC Policies with rates that are filed with and approved by the CDI; and (2) a profit-sharing agreement, the RPA, between the employer and AUCRA, through which the employer can share in the underwriting results of its workers' compensation losses. Depending on the employer's loss history over the duration of the Program, the employer's final costs under the RPA might be more or less than the premium owed under the CIC Policies. (SUMF at No. 6.)

AUCRA is structured as a segregated cell reinsurance facility, a common captive reinsurance structure. Rather than pool its reinsurance risk, each participant has a separate

1    underwriting account (or "cell"). The cells are legally separated so assets in one cell may not be

2    used to pay liabilities in another cell. This structure allows employers to participate in a captive

3    reinsurance arrangement without being potentially liable for another employer's workers'

4    compensation risks. (SUMF at No. 7.)

5          As part of this arrangement, the employer agrees to maintain a capital account in its

6    segregated cell. (SUMF at No. 8.) Because the ultimate claims costs cannot be known in advance,

7    "loss development factors" or "LDFs" (i.e., multipliers) are applied to claims to estimate their

8    final cost. (SUMF at No. 9.) The use of LDFs and reserves is not unique to the Program. LDFs

9    are actuarially based and commonly used in the industry to estimate future total claims costs in

10   loss sensitive workers' compensation programs. The RPA has two sets of LDFs: one set is used

11   during the three-year active term; another set with higher multipliers is used after the active term

12   expires (i.e., the "run off" period). (SUMF at No. 10.) The reserve amount is adjusted periodically

13   as claims resolve. Importantly, LDFs reduce over time until their impact on the ultimate costs

14   when a cell is closed is reduced to nothing. The RPA, which the participant signs, discloses all

15   these features.

16         A participant also agrees to maintain reserves in its cell after the RPA's three-year active

17   term expires because exposure under workers' compensation claims can sometimes continue for

18   several years. (SUMF at No. 11.) The reserve amount is adjusted periodically as claims develop.

19   The RPA also clearly discloses this requirement, which is not unique to the Program. Because

20   some workers' compensation claims remain open after the RPA's active term, employers with

21   loss sensitive programs must typically maintain reserves after the active term expires.

22         A single RPA covers the entire three-year period (SUMF at No. 12), but individual,

23   annual CIC Policies are issued to the employer in each of the three years. (SUMF at No. 13.) The

24   RPA sets minimum and maximum costs for the participant, thereby capping the participant's

25   maximum potential liability. The minimum and maximum are initially based on the employer's

26   estimation of payroll and are adjusted based on actual payroll. When the segregated cell is closed,

27   the employer's ultimate cost is calculated using the RPA's formulas and, depending on the claims

28   experience, the employer could receive a profit sharing distribution under the RPA. (SUMF at

DLA PIPER LLP (US)
SAN FRANCISCO

-4-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1  No. 14.) The RPA clearly discloses that a participant's cell may be liquidated in AUCRA's

2  discretion, and may take as many as seven years after Program termination to finally close,

3  depending on the ongoing incidence and payment of workers' compensation insurance claims.

4  (SUMF at No. 15.)

5          Participants are provided detailed disclosures through their own brokers in the form of a

6  Workers' Compensation Proposal & Rate Quotation ("Proposal") and Workers' Compensation

7  Summary & Scenarios ("Summary"), which explain how the Program works. In particular, these

8  disclosures explain that the Program includes both the filed, guaranteed cost policies but also a

9  separate "profit sharing plan" effectuated through a reinsurance transaction. (SUMF at No. 16.)

10  The Proposal clearly states that the profit sharing plan "is not a filed retrospective rating plan or

11  dividend plan." (SUMF at No. 17.) It also explains that the participant will be billed a "Net Pay-

12  In Amount" each month that includes workers' compensation premium under the policies, fees,

13  and capital deposits due to the participant's cell account under the RPA. (SUMF at No. 18.) The

14  "Net Pay-In Amount" incorporates a pay-in factor of 70% of the Loss Pick Containment Amount,

15  which provides upfront cash flow benefits to participants with low claim losses.

16      **B.      The CDI Has Approved the Sale of an Amended RPA, Which Has
                 Substantially the Same Features and Operates in the Same Manner as Pet
17               Food's RPA**

18          Notwithstanding the *Shasta* Order and the CDI's (flawed) findings regarding the Program

19  and the RPA, in the wake of that administrative proceeding, Defendants negotiated with the CDI

20  on a revised version of the Program, the RPA, and certain disclosures and developed a

21  Retrospective Rating Participation Agreement ("Amended RPA") that could be sold and marketed

22  with the CDI's approval in California. (SUMF at No. 19.) As Defendants' expert, Richard Fein,

23  concluded in analyzing the differences between the unfiled RPA and the Amended RPA, while

24  there are differences, none of them changes the structure, material terms, or financial results to the

25  participant or to AUCRA. (SUMF at No. 20.) Thus, largely the same RPA that Pet Food signed—

26  not once, but twice—is now approved for sale in California.

27  /////

28  /////

**C.     The Program Worked As Designed and Disclosed to Pet Food**

Pet Food's testimony and documentary evidence make clear that the Program worked as intended and as disclosed to Pet Food. The record also shows that Pet Food was a sophisticated consumer of workers' compensation insurance with many years of experience evaluating workers' compensation insurance options, and that it depended on its broker to explain the Program and enhance its understanding of the Program's main features and operation. The undisputed facts also show that Pet Food continued to participate in the Program even *after* it knew that the Program was allegedly unlawful and unconscionable. These facts disprove any injury in fact or entitlement to a remedy in equity.

**1.     Pet Food Is a Sophisticated, Knowledgeable Consumer of Workers' Compensation Insurance**

Pet Food is a pet food and supply retailer with 950 employees and annual revenue of $150 million. (SUMF at No. 21.) Pet Food's COO, Terrance Lim, who graduated from UC Berkeley in 1975 and attended seven years of graduate school, has overseen Pet Food's growth from six stores in 1994 to 63 stores by 2018. (SUMF at No. 22.) He has been responsible for purchasing Pet Food's workers' compensation insurance for the past 24 years. (SUMF at No. 23.) Before joining Pet Food, Mr. Lim had been responsible for purchasing workers' compensation insurance in his prior business for 12 years. (SUMF at No. 24.) Altogether, Mr. Lim has been in charge of buying workers' compensation insurance in California for 36 years. (SUMF at No. 25.)

Pet Food also regularly relies on its general counsel, John Moore, and consults outside counsel, to advise on regulatory and legal issues. (SUMF at No. 26.) At the time it purchased the Program from Applied, Pet Food worked with an insurance broker, Michael Gonzalez, who has over 20 years' experience with workers' compensation insurance, has been a licensed insurance broker for 18 years, and has a Series 7 securities broker's license. (SUMF at No. 27.) Mr. Gonzalez was very familiar with the Program. He presented the Program to over 40 prospective clients and placed 12 employers in the Program. (SUMF at No. 28.)

According to Mr. Lim, price is the most important consideration in acquiring workers' compensation insurance, followed by two other important features: company strength and claims

-6-

DLA Piper LLP (US)
San Francisco

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1   management. (SUMF at No. 29.) Whether a workers' compensation product was filed with an

2   insurance department was not a factor Pet Food considered when buying its workers'

3   compensation insurance, and Mr. Lim does not know whether such products are even required to

4   be filed with regulators. (SUMF at No. 30.)

5             **2.     Pet Food Extensively Reviewed the Program Materials Before**
                       **Purchase and Relied on Its Experienced Broker**
6

7          Pet Food entered into the Program for its 2009 workers' compensation insurance renewal.

8   Pet Food had been in guaranteed cost workers' compensation policies for years, but by 2009, its

9   workers' compensation rates had been steadily increasing for three or four years. (SUMF at

10  No. 31.) At the time, Pet Food had experienced a few years of increasing workers' compensation

11  insurance losses, causing its experience modification factor ("ex-mod") to reach 125% (or 1.25),

12  which Mr. Lim described as "terrible." (SUMF at No. 32.) Pet Food believed it could keep its

13  losses low and ultimately get lower rates from a loss sensitive plan than from a guaranteed cost

14  plan. (SUMF at No. 33.)

15         In September 2009, leading up to its annual October renewal, Pet Food had received only

16  one workers' compensation quote below $400,000 per year. (SUMF at No. 34.) Pet Food

17  obtained an EquityComp quote from Applied for a minimum of $423,000 and a maximum of $1.6

18  million over three years, based on annual estimated payroll of approximately $11 million. (SUMF

19  at No. 35.) This was a reduced price from Applied's original quote that Pet Food's broker

20  negotiated. (SUMF at No. 36.) Pet Food was interested in the Program because of the opportunity

21  for "lower rates" if it could limit its claims. (SUMF at No. 37.) Pet Food had been averaging

22  around $125,000 annually in workers' compensation insurance losses but believed it could lower

23  its losses to around $70,000 per year. (SUMF at No. 38.)

24         Before Pet Food decided to buy the Program, and before Mr. Lim signed the Request to

25  Bind on its behalf requesting that Defendants issue workers' compensation insurance policies to

26  Pet Food, Mr. Lim was presented with copies of the Proposal, the Summary, and the RPA.

27  (SUMF at No. 39.) Mr. Lim read the Program materials, including the RPA, "closely." (SUMF at

28  No. 40.) He took extensive notes on the Program documents, discussed them with Pet Food's

DLA PIPER LLP (US)
SAN FRANCISCO

-7-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1  broker, Mr. Gonzalez, and with Applied, and performed many calculations to estimate Pet Food's

2  payments. Mr. Lim calculated Pet Food's historic estimated average annual claims cost—

3  $125,000 per year—and then reviewed the Summary supplied by Applied to conclude that Pet

4  Food's ultimate cost at that claims level would be about $1 million for three years. (SUMF at

5  No. 41.) Mr. Lim believed, however, that Pet Food could limit its claims to an average of $70,000

6  per year, which would result in a three-year cost of around $895,000. (SUMF at No. 42.) Mr. Lim

7  liked the Program's three-year commitment that, unlike Pet Food's guaranteed cost options,

8  would avoid fluctuations in ex-mods and market prices during the three-year term. (SUMF at

9  No. 43.)

10        Mr. Lim's notes on the RPA indicate that he, among other things, understood how and

11  when a participant's cell may be closed after the Program's active term; reviewed Schedule 1 to

12  the RPA and was aware of the application of LDFs, run-off LDFs, and an Exposure Group

13  Adjustment Factor ("EGAF"); and understood that monthly payment amounts might "fluctuate

14  more" during the run-off period if Pet Food elected not to renew. (SUMF at No. 44.) Mr. Lim

15  understood that the pay-in under EquityComp was different from the premium under the CIC

16  Policies, and that the low monthly pay-in factor would be a benefit to Pet Food if it kept its claims

17  low throughout the Program. (SUMF at No. 45.)

18        Based on Mr. Lim's close review of the Program documents and conversations with Mr.

19  Gonzalez, Pet Food understood the Program before it signed up to participate. (SUMF at No. 46.)

20  Understanding that EquityComp was a "captive program," Pet Food was happy with the Program

21  three years into the first term. (SUMF at No. 47.) By March 2012, Pet Food calculated that it had

22  saved $200,000 thanks to the Program and recorded that the "discount" was improving each

23  month because of its good claims record—reflecting management's understanding of the

24  Programs' pay-in feature. (SUMF at No. 48.)

25        Satisfied with the Program, Pet Food requested and received a three-year renewal quote

26  from Applied in September 2012. (SUMF at No. 49.) Pet Food also obtained quotes for four

27  guaranteed cost policies from other insurers that ranged from $519,000 to over $748,000 per year.

28  (SUMF at No. 50.) Applied's proposal had a three-year minimum of $595,000 and a three-year

DLA PIPER LLP (US)
SAN FRANCISCO

-8-
POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1   maximum of $2.4 million, based on estimated annual payroll of approximately $16 million.

2   (SUMF at No. 51.) Pet Food's broker advised that it would pay more under EquityComp than the

3   lowest guaranteed cost option only if it had over $350,000 in claims per year, and Pet Food

4   thought it could keep its claims lower than that. (SUMF at No. 52.) Moreover, as Mr. Lim

5   admitted, if Pet Food had bought a one-year guaranteed cost policy and had high claims, the loss

6   experience would raise its ex-mod and increase the cost of the next year's renewal (SUMF at

7   No. 53), making the savings with Applied even more attractive since it was a three-year contract.

8           In Pet Food's negotiations with Applied regarding the 2012 renewal, Applied again

9   reduced its initial quote, which Mr. Lim estimated would save Pet Food $50,000 per year. (SUMF

10  at No. 54.) Before the 2012 renewal, Pet Food sent the RPA to its lawyers for review, after which

11  Mr. Lim negotiated the substantive terms of the RPA with Applied. (SUMF at No. 55.) As a

12  result of those negotiations, Pet Food's RPA was amended through an addendum that changed the

13  choice of law and arbitration provision. Pet Food sought no other changes in the negotiations.

14  (SUMF at No. 56.)

15          **3.      Pet Food Admits It Misunderstood How Rebates Would Be**
                      **Distributed, Negating Any Actual Loss of Money or Property**
16

17          After the 2012 renewal, Mr. Lim became dissatisfied with the Program because he

18  mistakenly believed that, as claims closed for the first three-year term, Pet Food would begin

19  receiving immediate "rebates." When asked to describe the manner in which Pet Food believes it

20  "has lost money or property as a result of its business transactions with Applied Underwriters,"

21  Mr. Lim testified that Pet Food believed that as claims closed, excess reserves would be returned

22  to it, but did not realize how long it would take to have any excess monies returned under the

23  terms of the Program. (SUMF at No. 57.)

24          Mr. Lim admitted, however, that the Program's "rebate" terms are "in the contract," but

25  that he "simply did not pick up on it." (SUMF at No. 58.) He also admitted that discussions with

26  his broker—not any representations by Applied—reinforced his misunderstanding. (SUMF at

27  No. 59.) Mr. Lim testified, for instance:

28  /////

DLA PIPER LLP (US)
SAN FRANCISCO

-9-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1   A. Now, I may have -- I think this is a demonstration that I didn't truly
2   understand how it worked, even though I signed those documents, as
    you've pointed out many times; that I -- I had the understanding, whether
    it was correct or not correct, that rebates would be forthcoming as things
3   closed out, and that's when we would be seeing the money.

4   Q. All right. Out of interest, was that understanding the result of
    conversations you had with Mike Gonzalez?

5   A. Yes.

6

7   (SUMF at No. 60.)[2] Moreover, even though Pet Food erroneously expected to receive more

8   regular and immediate rebates, Mr. Lim acknowledged that Pet Food "did get rebates as claims

9   closed" in at least one instance, negating Pet Food's claim that cash flow benefits and profit

10  returns were never provided until years after plan closure. (SUMF at No. 62.)

11       Further, although the timing of "rebates" is Pet Food's main complaint with the Program,

12  Pet Food admitted to actually receiving real-time reductions in price every month in the Program,

13  as designed, which effectively functioned as a real-time rebate or cash flow benefit:

14  Q. In the Applied program, there was, as you know, the 70 percent Pay-In
    Factor; right?

15  A. Yes.

16  Q. Which tended to reduce actually what you had -- Pet Foods had to lay
    out up front?

17  A. Yes.

18  Q. All right. And that is a cash-flow benefit, is it not?

19  A. I guess I would agree.

20  Q. And if you don't have to give that money back because the losses are
    low, you're actually being rebated as time goes along, are you not?

21

22  A. I think you're correct.

23  (SUMF at No. 63.) Mr. Lim agreed that the 70-percent pay-in factor meant that "essentially,

24  you're getting the rebate as time goes along…as long as your claims are low." (SUMF at No. 64.)

25  /////

26  /////

27  _____

28  [2] Pet Food complained in writing to another broker that EquityComp had been misrepresented by
    its broker, Mr. Gonzalez, but not by Applied. (SUMF at No. 61.)

**4.    Pet Food Renewed the Program for a Seventh Year Despite Having Read Published Complaints About the Program, Indicating Its Understanding and Acceptance**

On October 1, 2015, Pet Food renewed the Program for a seventh year, after having signed two Requests to Bind and RPAs to implement two three-year Programs. (SUMF at No. 65.) By that time, Pet Food, through its General Counsel, Mr. Moore, had extensively investigated the Program, including by accessing court files regarding cases against Applied and reviewing trade journal articles. (SUMF at No. 66.) Mr. Moore declared that

> By the middle of 2015, I [Mr. Moore] was convinced that the arbitration agreement in PFE's EquityComp agreement was unenforceable, that the plan had worked differently than represented to PFE in the Applied marketing materials, and that it would be unconscionable under California law for Applied to enforce the EquityComp RPA.

(SUMF at No. 67.)

Pet Food management had also reviewed articles and lawsuits and had heard "a lot of talk about problems with the program." (SUMF at No. 68.) Pet Food was concerned the Program was not fair and that it was paying more than it should, even though it was saving money in the Program compared to the guaranteed cost quotes it had received. (SUMF at No. 69.) In April 2015, Pet Food was sent an article titled, "Berkshire Hathaway's EquityComp Program Problems," which discusses in detail the complaints made by Shasta Linen to the CDI about the Program, and which essentially recites the allegations and substance of the complaint Pet Food ultimately filed in this lawsuit. (SUMF at No. 70.) By July 2015, Mr. Lim had begun reading about lawsuits against Applied and consulted Mr. Moore and other brokers about them. (SUMF at No. 71.) Then, on September 22, 2015, just one week before Pet Food's one-year extension, Mr. Lim received another article from Mark Witriol, Pet Food's owner, entitled: "Beware Applied Underwriters Workers' Compensation Insurance," which again recited the very allegations Pet Food is asserting in this litigation. (SUMF at No. 72.)

Despite being aware of the allegations about the Program, its own General Counsel's conclusions that the Program and the RPA were "unconscionable," and the fact that Pet Food had other viable workers' compensation insurance options for its 2015 renewal (including guaranteed cost, loss sensitive, and captive program options), Pet Food decided to renew the Program for

-11-

1  another year. (SUMF at No. 73.) It did so because it was the lowest quote by $17,000, out of

2  premiums over $1 million. (SUMF at No. 74.) The news articles and lawsuits Pet Food had read

3  "didn't deter [it] from wanting to do the Extension Agreement" because "at that point in time, we

4  felt that we had a clear understanding of what the parameters were and what—what the maximum

5  cost would be. So we knew exactly what we were getting into," and "it was our…best option at

6  the time." (SUMF at No. 75.)

>      **5.      Pet Food Performed Well Under the Program Under Any Metric**

8      Despite Pet Food's complaints about the timing of rebates under the Program—which Mr.

9  Lim admitted was disclosed "in the contract"—Pet Food performed well under the Program under

10  any reasonable metric. Most significantly, Pet Food did better under the supposedly "unlawful"

11  RPA than it did under the filed and CDI-approved guaranteed cost CIC Policies, saving in excess

12  of $600,000. (SUMF at No. 76.) Indeed, Pet Food admitted that it could not be part of a proposed

13  revised class of allegedly injured California Program participants because it paid *less* under the

14  RPA than it would have under the filed and approved CIC policies alone, and thus was not

15  injured. (SUMF at No. 77.)

16      Moreover, Pet Food's ultimate performance under the Program was consistent with the

17  quotes and proposals provided by Defendants, meaning Pet Food got what it expected and

18  bargained for, belying any injury. For its 2009-2012 Program term, Pet Food was quoted a three-

19  year minimum of approximately $423,000 and a three-year maximum of approximately $1.6

20  million, based on estimated annual payroll of approximately $11,000,000 ($33,000,000 for three

21  years). (SUMF at No. 78.) When adjusted for Pet Food's 26% increase in payroll, to $42,084,445

22  over three years (SUMF at No. 79), the minimum and maximum range increased to

23  approximately $532,980 to $2,016,000. (SUMF at No. 80.) Pet Food's ultimate cost under the

24  first three-year term was $1,626,270.06, well within that range. (SUMF at No. 81)

25      The same is true for Pet Food's second term, from 2012 to 2016. Applied's second-term

26  proposal had a three-year minimum-maximum range of approximately $595,000 to $2.4 million

27  respectively, based on estimated annual payroll of approximately $16 million (or $64 million over

28  four years). (SUMF at No. 82.) When again adjusted for Pet Food's 35% payroll increase, to

$86,877,271 over four years (SUMF at No. 83), Pet Food's three-year minimum and maximum increased to approximately $803,000 and $3,240,000. (SUMF at No. 84.) Pet Food's ultimate cost under the second term of the Program totaled $2,668,964.82—again, well within the adjusted minimum and maximum range that Pet Food agreed to and bargained for. (SUMF at No. 85.) The Program thus worked well for Pet Food even despite significant increases in claims activity over its seven years in the Program.

Similarly, Pet Food's costs under the Program were comparable to or less than the costs it was quoted from other carriers. Pet Food paid $1,626,270.06 for its first three-year term, or an average of $542,090.02 per year. (SUMF at No. 86.) All but one of the competing options Pet Food was quoted in 2009 were over $400,000 per year. (SUMF at No. 34.) Those policies would have cost Pet Food about the same or more per year as the Program when adjusted for the 26% increase in payroll. (SUMF at No. 87.)

Likewise, under the second term, Pet Food's ultimate costs were less than it would have paid under the alternative options it was presented for its 2012 renewal. Pet Food's ultimate costs under the second term of the Program totaled $2,668,964.82, or an average of $667,241 per year over four years. (SUMF at No. 88.) Pet Food received quotes in 2012 ranging from $519,000 to over $748,000 per year. (SUMF at No. 89.) When adjusted for Pet Food's 35% payroll increase, that range would increase to $700,650 to $1,009,800 per year. (SUMF at No. 90.) Accordingly, under any alternative workers' compensation policy available to Pet Food at the time, Pet Food would have paid *more* per year than the average annual cost Pet Food was charged under the Program.

### 6. Pet Food Has No Witness Who Can Quantify Its Monetary Loss and Restitution

Even if Pet Food *could* prove some monetary loss as a result of any conduct by Defendants, Pet Food has no evidence to support its alleged loss or damages. The sole basis of Pet Food's supposed loss of money or property is its complaint regarding the timing of rebates under the Program (which it admits was disclosed in the contract). Indeed, in its motion for summary judgment, Dkt. 138-1, Pet Food argues for restitution solely of the "rebate" it claims it is owed.

*See* Dkt. 138-1 at 14. But Pet Food has no witness who can testify regarding the calculation of any amounts Pet Food allegedly lost as a result:

> Q: Who at Pet Food, if anyone, has made a calculation as to precisely what it is that Pet Food believes its [sic] owed by Applied Underwriters?
>
> A: To the best of my knowledge, our attorney has done that.
>
> ***
>
> Q: Has Pet Food done any calculation as to what the – its loss might be as a result of some inaccuracy with the modification premium due to the EGAFs?
>
> A: I believe our attorney has.
>
> Q: But the company has not?
>
> A: Not internally.

(SUMF at No. 91.) Pet Food's attorney, Mr. Moore, cannot testify regarding its purported losses, particularly where Pet Food has refused to allow him to be deposed and has taken the position that he will not be a witness in this case.

Nor has Pet Food disclosed any expert witness to offer such calculations of Pet Food's purported economic losses. Accordingly, Pet Food has no evidence from which it can prove any economic loss even assuming it could establish liability based on the (fully disclosed) practices it alleges caused its harm. And again, Pet Food's COO and 30(b)(6) witness, Mr. Lim, admitted that the timing of rebates was fully disclosed in the contract, but that he simply overlooked it.

## III.   ARGUMENT

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party on a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), *cert. denied*, 484 U.S. 1066 (1988).

The moving party does not, however, have a burden of affirmatively demonstrating with

1    admissible evidence that there is a lack of any genuine issue of material fact as to each claim.

2    *Estate of Gonzales v. Hickman*, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *5 n.42

3    (C.D. Cal. May 30, 2007). "In other words, under Rule 56, a defendant is not required to prove a

4    negative—i.e., the *absence* of genuine issues of material fact—to establish his or her entitlement

5    to summary judgment. Rather, the party may simply assert that there is no evidence to

6    substantiate the material allegations of the complaint." *Id.* (discussing *Celotex*, 477 U.S.

7    at 323-24); *see also Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006)

8    (moving party that lacks burden of proof at trial "need not disprove the other party's case" but

9    "can meet its burden by pointing out the absence of evidence from the non-moving party").

10    Summary judgment is also appropriate where a motion "raises questions of law, the

11    resolution of which does not involve disputed 'material' facts. *Delbon Radiology v. Turlock*

12    *Diagnostic Ctr.*, 839 F. Supp. 1388, 1391 (E.D. Cal. 1993). Such issues of "pure law" include the

13    interpretation of statutes, regulations, and legislative history (*see, e.g.*, *Edwards v. Aguillard*, 482

14    U.S. 578, 594 (1987) ("A court's finding of improper purpose behind a statute is appropriately

15    determined by the statute on its face, its legislative history, or its interpretation by a responsible

16    administrative agency.") and the determination of whether a party has standing to enforce a

17    statute (*see, e.g.*, affirming a grant of summary judgment holding that plaintiff had no standing to

18    sue under the Clayton Act). Further, although courts may not weigh evidence in considering a

19    motion for summary judgment in a jury trial, "a district court has somewhat greater discretion to

20    consider what weight it will accord the evidence in a bench trial." *Matter of Placid Oil Co.*, 932

21    F.2d 394, 397 (5th Cir. 1991).

22    Here, the evidence shows that there is no triable issue of fact as to requisite elements of

23    either of Pet Food's remaining claims. Further, the Motion presents matters of pure law, and this

24    action is to be tried by the Court instead of a jury. April 17, 2019 Order, PFE Dkt. # 128, at 6-7

25    (noting the cases "will be tried as a bench trial"). Under these circumstances, the Court has

26    discretion to consider what weight it will give to the evidence and to reach the proper "inferences

27    and conclusions." *Id.* at 398. Defendants are thus entitled to summary judgment.

28

DLA PIPER LLP (US)
SAN FRANCISCO

-15-
POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

**A.      Pet Food's UCL Claim Must Fail Because the Undisputed Evidence Shows That Pet Food Suffered No Harm As a Result of Defendants' Conduct**

A claim under California's UCL cannot survive unless a plaintiff can prove two essential threshold elements of standing: (1) actual economic injury and (2) causation. Pet Food can prove neither element—indeed, the evidence makes the absence of those elements undeniable. Pet Food's UCL claim must therefore fail.

California's UCL, much like Article III of the United States Constitution, imposes a threshold standing requirement on would-be claimants. To have standing under the UCL, a plaintiff must have suffered "injury in fact," meaning "lost money or property." *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 849 (2008). And that loss must be "as a result of"—i.e., *caused by*—the defendant's alleged unfair competition. *Id.* The facts here belie Pet Food's assertion that it has suffered any harm that could qualify as "injury in fact." Pet Food paid *less* money under the Program than it would have paid for the filed and approved CIC Policies, and even under its available alternatives for workers' compensation insurance coverage when changes in payroll and ex-mod are accounted for. Even if such an injury were presumed, no conduct by Defendants could have caused that injury because, as Pet Food has admitted, it "knew exactly what [it was] getting into" with the Program—alleged illegality and unconscionability and all. (SUMF at Nos. 4, 75.) Pet Food simply cannot make the requisite showing. The Court should therefore grant the Motion as to Pet Food's UCL claim.

**1.      Pet Food's UCL Claim Must Fail Because Pet Food Has Not Suffered Injury in Fact**

Based on the facts set forth above, summary judgment of Pet Food's UCL claim is proper because Pet Food cannot prove injury in fact, which is a threshold element of its UCL claim. Many kinds of harm will satisfy the UCL's requirement of "lost money or property," including paying more or acquiring less in a transaction than the plaintiff otherwise would have; having a property interest diminished; being denied money or property to which the plaintiff is legally entitled; or having to enter into a monetary transaction that would not otherwise have been necessary. *Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1137 (S.D. Cal. 2012). The thread

-16-

DLA PIPER LLP (US)
SAN FRANCISCO

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1    that unifies these disparate forms of harm is that, in each, the plaintiff must show that it lost

2    money or property as a result of the unfair competition alleged. But Pet Food cannot claim to

3    have lost money or property from its participation in the Program. In addition to admitting that it

4    did better under the Program than under the CIC Policies, by any objective measure, Pet Food did

5    at least as well in the Program as it could have done in any plausible alternative circumstance.

6    Because Pet Food cannot show that it suffered any injury in fact, and because the evidence shows

7    that it did not, Pet Food's UCL claim is meritless as a matter of law. The Motion should thus be

8    granted as to this claim on that basis alone.

9            First, and most importantly, Pet Food paid less under the Program than its premium under

10   the filed and CDI-approved CIC Policies. (SUMF at No. 6.) That CIC would issue the separate,

11   annual guaranteed cost CIC Policies was disclosed to Pet Food in materials provided to Pet Food

12   and its broker before Pet Food decided to participate in the Program. (SUMF at No. 92.) Pet Food

13   acknowledged receipt of those disclosures, opted to participate in the Program, and received each

14   of the seven annual CIC Policies and the benefits thereunder. (SUMF at No. 93.) And even with

15   its unanticipated increases in payroll and claims, Pet Food *still* performed better under the RPA

16   than it would have under just the filed and approved CIC Policy rates. Pet Food's total Program

17   cost over its seven years, including premium taxes and assessments, was $4,295,234.88,

18   compared to $4,927,308 under the CIC Policies' filed and approved rates. (SUMF at No. 94.)

19   Were Pet Food to succeed in having this Court find the RPA void and unenforceable, then under

20   the *Shasta* Order, Pet Food—like Shasta—would remain liable to CIC for any unpaid premiums

21   under the filed and approved CIC Policy rates. *See Shasta* Order at 68-69. Based on Pet Food's

22   performance in the Program, it would *owe* $606,740 to CIC if the RPA were deemed void and

23   unenforceable. With a net gain of over $600,000 attributable to its participation in the Program,

24   Pet Food cannot say it has "lost money or property" "as a result of" the Program. Indeed, Pet

25   Food admitted to this Court that it could not be a member of a class of allegedly injured

26   participants because it paid *less*, not more, under the allegedly unlawful RPA as compared to the

27   filed and approved CIC policies.

28          Likewise, as shown above, Pet Food performed well under the Program both as compared

DLA PIPER LLP (US)
SAN FRANCISCO

-17-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1  to the minimum and maximum costs disclosed to it in the Program materials (when adjusted for

2  Pet Food's actual increases in payroll) and to the alternative workers' compensation insurance

3  options Pet Food was quoted for both its 2009 and 2012 renewals. (*See supra* at Section II.C.5;

4  SUMF at Nos. 5, 50, 84, 86.) That Pet Food performed as well or better under the Program than it

5  would have under any other policy available to it in the market belies any actual harm or injury in

6  fact, or that any harm was *caused by* any conduct by Defendants. There can be no injury if the

7  outcome would have been the same (or worse) regardless of whether Defendants filed and sought

8  approval of the RPA.

9         Finally, there is no scenario in which Pet Food could simply have foregone the cost of

10  workers' compensation insurance and thus claim its payments under the Program constituted per

11  se economic injury. California Labor Code section 3700 mandates that every private employer

12  obtain workers' compensation insurance. This is not, therefore, a situation in which Pet Food was

13  "required to enter into a transaction, costing more money or property, that would otherwise have

14  been unnecessary." *Martinez*, 907 F. Supp. 2d at 1137.

15         In Pet Food's own motion for summary judgment, Pet Food claims entitlement to

16  "restitution" under the UCL in the form of a return of the money in its segregated cell—i.e., its

17  "rebate"—plus a "return on investment." *See* Dkt. 138-1 at 14-15. First, as shown above, Pet

18  Food *admits* that the timing of rebates was fully disclosed in the contract, but Mr. Lim simply did

19  not "pick up on it." (SUMF at No. 58.) And Pet Food also admits that it has been receiving

20  rebates all along throughout its participation in the Program, and continues to receive rebates up

21  to today as time passes and the likelihood of additional claims activity and exposure continues to

22  decrease. (SUMF at No. 95.) Accordingly, Pet Food's argument that there is "no just basis to

23  allow Applied to retain PFE's rebate either for 3 years since the last claim closed or 7 years after

24  expiration in the policy" is far from undisputed given Mr. Lim's sworn testimony and admission

25  that this information was fully disclosed to Pet Food. *See* Dkt. 138-1 at 14. Quite the opposite, it

26  is clear that Pet Food has no provable claim for restitution in light of its admissions regarding

27  how rebates actually work under the Program, which again supports summary judgment in

28  Defendants' favor.

DLA PIPER LLP (US)
SAN FRANCISCO

-18-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1   The bottom line is that Pet Food's ultimate performance in the Program was consistent

2   with the original proposals Pet Food received (adjusted for payroll), but its costs were higher than

3   originally estimated because Pet Food's claims losses rose significantly during its seven years in

4   the Program. Despite that, Pet Food still outperformed the Program's adjusted maximum cost, the

5   CIC Policy premiums, *and* the vast majority of quotes it received from other insurers for

6   guaranteed cost policies (when adjusted for payroll). These indisputable facts show that Pet Food

7   suffered no economic injury sufficient to confer standing under the UCL. Summary adjudication

8   of this claim is therefore warranted.

9         **2.      Pet Food's UCL Claim Must Fail Because, Under the Facts of This Case, No Conduct by Defendants Could Have Caused Pet Food's**

10        **"Harm"**

11  Pet Food's UCL claim fails for the additional reason that, even if Pet Food *had* suffered

12  economic harm from its participation in the Program (although it did not), no evidence supports

13  the contention that such harm was somehow caused by Defendants' conduct. Pet Food cannot

14  show any harm *caused by* the mere fact that the RPA between it and AUCRA was not filed with

15  the CDI. Neither can Pet Food show that any representations or omissions it attributes to

16  Defendants caused its "harm," since Pet Food was well acquainted with the very Program details

17  it gives as the basis for its claims. Because Pet Food's UCL claim cannot overcome this threshold

18  of standing the UCL imposes, the Court has an independent basis for granting summary judgment

19  as to this claim.

20  First, the mere fact that the RPA was not filed could *not* cause Pet Food's alleged injury.

21  To begin, the Program materials themselves disclosed that the Program was "not a filed

22  retrospective rating plan or dividend plan." (SUMF at No. 1.) Further, not only has the CDI since

23  approved a version of the Program and the RPA that is substantially the same in form and

24  function as the one in which Pet Food participated, but Pet Food testified that whether the RPA

25  was filed or not was not a factor it considered in deciding to purchase the Program. (SUMF at

26  No. 30.) Pet Food cannot point to any evidence to show that it suffered harm *because* the RPA

27  was not filed, or that its experience in the Program would have been any different had the RPA

28  been filed versus not. Even if Defendants had filed the RPA and the CDI had rejected it, which

1    would have made the RPA unavailable for Pet Food to purchase, Pet Food could not prove any

2    harm under that scenario either because the prices available to it from other insurance carriers

3    were the same as or *more* than the average annual price it paid under the Program. (SUMF at

4    Nos. 5, 50, 86.) There is no evidence from which to conclude that the RPA's unfiled status

5    somehow caused Pet Food's purported harm. Indeed, Pet Food's own motion for summary

6    judgment is tellingly silent regarding the essential element of causation. Nowhere in the motion

7    does Pet Food even attempt to link Defendants' failure to file the RPA and its alleged illegality to

8    the harm purportedly suffered by Pet Food. *See* Dkt. 138-1.

9          Second, Pet Food cannot seriously maintain that any representation or omission in the

10    Program materials caused it any economic injury because by its own account, it did not rely on

11    any such representation or omission. To begin with, "a UCL action predicated on fraud requires

12    actual reliance." *Princess Cruise Lines, Ltd. v. Superior Court*, 179 Cal. App. 4th 36, 43 (2009).

13    Yet Pet Food's extensive review of the Program and its decision to renew the Program *twice*,

14    including after it had investigated the Program and its lawyer had concluded the Program was

15    "unconscionable," belies reliance on any allegedly misleading or unfair aspects of the Program

16    that form the basis of its UCL allegations, or that it would have behaved differently had it

17    "known" of those aspects at the time of purchase. The basic premise of reasonable reliance and

18    causation is that, had the plaintiff been aware of the information that was allegedly not disclosed

19    or not fully explained, the plaintiff would have acted differently—i.e., it would not have

20    purchased the product. Accordingly, where a plaintiff continues to purchase a product *after*

21    learning about its allegedly unfair or misleading aspects, there can be no reliance or causation,

22    and thus no claim. *See*, *e.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner &*

23    *Smith, Inc.*, 119 F.R.D. 344, 348-49 (S.D.N.Y. 1988) (plaintiff's reliance doubtful where

24    purchases continued *after* it "learned about the alleged fraud of which plaintiff now complains");

25    *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Penn. 2003) (plaintiff's increase in stock

26    holdings "after public disclosure of the alleged fraud" showed he "would have made—and in fact

27    did—purchase stock regardless of the fraudulent omission"). Similarly, where a plaintiff testifies

28    that the supposedly misleading representations were not a factor in deciding to enter the

DLA PIPER LLP (US)
SAN FRANCISCO

-20-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1  transaction in question, there can be no reliance on those representations *as a matter of law*. *See*

2  *Princess Cruise Lines*, 179 Cal. App. 4th at 43-44 (finding no reliance as a matter of law where

3  plaintiff testified in deposition that the defendant's representations had no effect on the decision

4  to purchase).

5        Here, not only did Pet Food extensively review and analyze the Program's terms and

6  features at the outset, but before renewing a second time, Pet Food investigated the Program and

7  read articles and lawsuits asserting exactly the kinds of claims and allegations Pet Food has made

8  in this case. (SUMF at Nos. 41, 44, 46, 55, 66, 68.) Its General Counsel concluded from that

9  investigation that the RPA was unlawful and "unconscionable" and could not be enforced in

10  California. (SUMF at No. 67.) Yet armed with this knowledge, Pet Food still chose to renew the

11  Program for a seventh year because it "knew exactly what we were getting into" and "it was [Pet

12  Food's]…best option at the time," by just $17,000. (SUMF at No. 4.) That Pet Food voluntarily

13  repurchased the Program even after learning of the allegations and claims it would later file in

14  this lawsuit shows that Pet Food did not, in fact, rely on, nor was it harmed, by any of the

15  allegedly unlawful, unfair, or fraudulent practices asserted in its complaint. As its 30(b)(6)

16  witness testified, Pet Food was in search of the best price, plain and simple. (SUMF at No. 29.)

17        By any theory, Pet Food cannot show that it suffered any economic injury "as a result of"

18  Defendants' conduct. This conclusion is reinforced by Pet Food's own motion for summary

19  judgment failing even to mention the issue of causation. Had Defendants filed the RPA with, and

20  obtained approval from, the CDI, Pet Food would have received substantially the same terms that

21  it did, as evidenced by the filed and approved Amended RPA. And Pet Food renewed its

22  participation in the Program even *after* being fully apprised of the Program's supposedly

23  "unconscionable" terms and the RPA's unfiled status, meaning it cannot now claim it relied on

24  those terms in choosing to participate in the Program. Because the evidence belies causation, a

25  threshold requirement under the UCL, Pet Food's UCL claim is unsustainable. The Court should

26  grant the Motion.

27  ///

28  ///

DLA PIPER LLP (US)
SAN FRANCISCO

-21-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

**B.     Pet Food's Quasi-Contract Claim Must Also Fail Because Pet Food Cannot Show Actual Harm or Injury in Fact**

The lack of injury also dooms Pet Food's quasi-contract claim for unjust enrichment as surely as it did Pet Food's UCL claim. To state a claim for quasi-contract, Pet Food must prove (1) Defendants' "receipt of a benefit" and (2) "unjust retention of that benefit at the plaintiff's expense." *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008)). A claim for quasi-contract, like Pet Food's UCL claim, requires a showing of actual harm or injury in fact. *See Peterson*, 164 Cal. App. at 1593-96. Because the evidence shows that these elements are missing here, and because Pet Food cannot adduce evidence showing otherwise, Pet Food cannot prevail on this claim. Hence, summary judgment is appropriate.

For instance, in *Peterson*, the plaintiff, like Pet Food here, brought claims for unfair competition and unjust enrichment on the basis of the defendant insurer's breach of certain Insurance Code provisions. *Peterson*, 164 Cal. App. 4th at 1586. Like here, the plaintiff in *Peterson* "received the benefit of the bargain" in the form of "the exchange [the plaintiff] expected"—the bargained-for insurance at the bargained-for price. *Id.* at 1593. On this basis, the court in *Peterson* held that the plaintiff had suffered no actual harm so as to confer standing for unjust enrichment. As explained in depth above, the same is true here. Because Pet Food cannot claim to have suffered any injury in fact as a result of the alleged unlawfulness of the Program, it cannot prevail on its quasi-contract claim for unjust enrichment. The Court should therefore grant the Motion as to this claim.

**C.     Pet Food's Quasi-Contract Claim Fails for the Additional Reason That Pet Food Lacks Standing to Enforce the Insurance Code and Related Regulations**

Pet Food's quasi-contract claim for rescission fails as a matter of law for the additional reason that it is based on alleged violations of Insurance Code sections 11658 and 11735, and California Code of Regulations, title 10, sections 2268 and 2218, for which there is no private right of action. This Court has already held that "Section 11658(a) does not provide a private right of action," which should be the end of the subject. *See* MTD Order at 19. Yet Pet Food expressly

1    argues that Defendants' alleged violation of these provisions, which establish form-filing

2    requirements for issuers of workers' compensation insurance policies and endorsements, render

3    the Program "illegal and void." Pet Food then bases its quasi-contract (unjust enrichment) claim

4    on the RPA being allegedly "illegal and void." The claim is therefore based on alleged violations

5    of legal provisions that provide no private right of action, meaning that private litigants have no

6    standing to enforce them. Because Pet Food lacks standing as a matter of law to enforce these

7    sections, its quasi-contract claim is properly disposed of by summary judgment.

8            The gravamen of Pet Food's claim here is that the RPA is "illegal and void" because it

9    "has not been filed with the WCIRB and/or approved by the CDI as required by California

10   Insurance Code sections 11658 and 11735 and California Code of Regulations, title 10, sections

11   2268 and 2218." Second Am. Class Action Compl., Dkt. 54, ¶39. California's workers'

12   compensation regime does not provide a private right of action for employers seeking relief for

13   noncompliance with these filing requirements. Pet Food, as a private party, may not rely on a

14   statutory or regulatory breach to recover against Defendants absent a private right of action. "[A]

15   statute creates a private right of action only if the statutory language or legislative history

16   affirmatively indicates such an intent." *Farmers Ins. Exchange v. Super. Ct.*, 137 Cal. App. 4th

17   842, 850, 853 (2006). The absence of an express provision authorizing private enforcement of the

18   statute is significant, as "one would reasonably have expected that the Legislature simply would

19   have directly imposed such" language had it wished to create a private right of action. *Crusader*

20   *Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 132 (1997) (quoting *Moradi-Shalal v.*

21   *Fireman's Fund Ins. Cos.*, 46 Cal. 3d 287, 295 (1988)).

22           When a law has no express private right of action, courts may infer such a right only when

23   the "legislative intent"—including legislative history, statutory context, and other related

24   factors—suggests the Legislature intended to establish a private right to sue. *Crusader*, 54 Cal.

25   App. 4th at 123. The court must also "determine[s] that the remedy is appropriate in furtherance

26   of the purpose of the legislation and needed to assure the effectiveness of the provision."

27   *Middlesex Ins. Co. v. Mann*, 124 Cal. App. 3d 558, 570-71 (1981). But when a regulatory statute

28   provides "a comprehensive scheme for enforcement by an administrative agency, . . . courts

DLA PIPER LLP (US)
SAN FRANCISCO

-23-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1  ordinarily conclude that the Legislature intended the administrative remedy to be exclusive,"

2  *Farmers Ins. Exchange*, 137 Cal. App. 4th at 850, and thus that a private right of action is

3  unneeded because "the comprehensive administrative enforcement scheme assures the

4  effectiveness of the statute," *Arriaga v. Loma Linda University*, 10 Cal. App. 4th 1556, 1564

5  (1992), *superseded by statute on other grounds*.

6  Also, although courts retain jurisdiction over common-law causes of action for which an

7  alleged violation of a regulatory statute establishes an element, that exception does not apply

8  when a plaintiff—like Pet Food here—"would have no claim" absent a regulatory statute that

9  provides no independent right of action. *Crusader*, 54 Cal. App. at 126. In fact, courts have

10  applied this principle specifically in the context of unjust enrichment. *See Peterson,* 164 Cal.

11  App. 4th at 1595-96 (dismissing a claim predicated on alleged Insurance Code violation because

12  plaintiffs lacked standing to bring an action under the Insurance Code and could not do so "under

13  the guise of unjust enrichment").

14  Further, section 11658 explicitly vest enforcement authority exclusively in the

15  Commissioner. *See* Cal. Ins. Code § 11658(b) ("If *the [C]ommissioner* notifies the insurer that the

16  filed form or endorsement does not comply with the requirements of law . . . it is unlawful for the

17  insurer to issue [it] . . . .") (emphasis added).[3] Regulation 2268 similarly provides that an insurer

18  in violation of its regulations or those set forth in § 11658 "shall be subject to proceedings

19  pursuant to §§ 701, 704(b) and 1065.1." The plain language of these insurance laws makes clear

20  that enforcement authority lies exclusively with the Commissioner and the CDI.[4]

21  _____

22  [3] Indeed, as this Court has held, even if a form is not filed in violation of § 11658, the policy
remains in force unless and until the Commissioner notifies the insurer that it does not comply
23  with the requirements of law. Cal. Ins. Code § 11658(b); MTD Order at 1 (dismissing claims
based on allegations that RPA was an unfiled rate plan under Cal. Ins. Code § 11735 because "the
24  use of a rate that has not been filed as required by § 11735 is not an unlawful rate unless and until
the Commissioner conducts a hearing and disapproves the rate").

25  [4] The Commissioner has exclusive authority to impose various penalties, ultimately including
conservation and liquidation proceedings when an insurer has violated "its charter or any law of
26  the state." Cal. Ins. Code § 1011(e). The Commissioner must establish a program to investigate
complaints, respond to inquiries and, when warranted, bring enforcement actions against insurers
27  or insurance producers. *Id.* § 12921.1. Violation of any law or regulation relating to the business
of insurance may be prosecuted through an enforcement action. 10 Cal. Code Regs. § 2591.1.
28  When the Commissioner believes an insurer is violating the law, he may hold a hearing upon 20-
30 days' notice to the insurer. Cal. Ins. Code § 1605.1. The Commissioner has full powers to

1    This is further supported by related sections of the Insurance Code, including § 11730, *et*

2  *seq.*, governing rate regulation, which set forth circumstances where the Commissioner, and *only*

3  the Commissioner, may disapprove rates used to calculate premiums. *See, e.g.*, Cal. Ins. Code

4  § 11737(d) (requiring the Commissioner to serve notice and schedule a hearing before

5  disapproving rates), 11737(g) (providing for only prospective disapproval of rates), 11737(h)

6  (requiring the Commissioner to "specify interim rates for the insurer" if prior rates are

7  disapproved). At the same time, § 11650, *et seq.*, is silent on whether a plaintiff may bring suit to

8  rescind allegedly noncompliant policies. The legislature's failure to specifically provide a private

9  right of action while providing a "comprehensive scheme for enforcement" of the relevant

10  provisions of the Insurance Code by the Commissioner means there is no private right of action.

11  *See Farmers Ins. Exchange*, 137 Cal. App. 4th at 850; *see also Moradi-Shalal*, 46 Cal. 3d at 300

12  (no private right of action under Unfair Insurance Practices Act because the statute called for

13  "administrative enforcement" and made "no mention . . . of a possible private civil remedy").

14    Indeed, the Commissioner took full advantage of the available exclusive enforcement

15  mechanisms and administrative remedies in the *Shasta* Order on which Pet Food expressly relies.

16  The *Shasta* Order confirms the Commissioner's broad exclusive authority and discretion to

17  enforce § 11658, precluding any implied private right of action. Shasta Linen, a participant in the

18  Applied Defendants' Program, filed a complaint with the CDI's Administrative Hearing Bureau

19  on August 29, 2014, alleging, like Pet Food here, that the Program constituted an unfiled and

20  unapproved insurance program. After a series of written submissions and interim decisions, the

21  Commissioner issued a Decision and Order on June 20, 2016, which held that the RPA was an

22  unfiled collateral agreement in violation of § 11658 (among other Insurance Code provisions).

23

24  examine and subpoena witnesses to attend, testify, and produce documents before him on any
subject touching insurance business, or in aid of his duties. *Id.* § 12924. If the Commissioner
25  determines that an insurer is violating any state law, the Commissioner may serve on the insurer
"such order or orders as shall be reasonably necessary to correct, eliminate or remedy such"
26  violation. *Id.* §§ 1605.1, 1605.3. The Commissioner may also revoke or suspend an insurer's
license or certificate of authority for violating or failing to comply with his orders, or levy fines
27  for each day that the violation or failure to comply continues. *Id.* § 1065.5. The Legislature's
broad enforcement scheme plainly vests in the Commissioner the full authority to enforce
28  § 11658 and thus to "assure[] the effectiveness of the statute." *Arriaga*, 10 Cal. App. 4th at 1564.

DLA PIPER LLP (US)
SAN FRANCISCO

-25-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1    The Commissioner then issued a Notice of Hearing and Order to Cease and Desist on June 28,

2    2016, seeking an order requiring CIC and AUCRA to cease and desist from issuing policies

3    incorporating the RPA. *Id.* Ex. 2. CIC filed a Verified Petition for Peremptory Writ of Mandate

4    (the "Writ Proceeding") challenging the June 20 Order.

5           While the Writ Proceeding was pending, the parties executed a Stipulated Consent Cease

6    and Desist Order on September 6, 2016, in which the parties agreed, among other things, that CIC

7    and AUCRA would cease and desist from issuing or renewing RPAs until the RPA was submitted

8    in compliance with Insurance Code §§ 11658 and 11735, but that CIC may renew any CIC Policy

9    issued in connection with an RPA in force as of July 1, 2016, and continue to enforce RPAs

10   subject to small changes to the arbitral forum and run-off loss adjustment factor provisions. *Id.*

11   Ex. 3. On June 2, 2017, CDI, CIC, and AUCRA entered into a Settlement Agreement through

12   which the parties agreed to dismiss the Writ Proceeding and that an Amended RPA would be

13   filed allowing new RPAs to issue under the Program. *Id.* Ex. 4. The *Shasta Linen* history

14   unequivocally demonstrates the "comprehensive scheme for enforcement" provided to the

15   Commissioner and CDI under the Insurance Code. *See Farmers*, 137 Cal. App. 4th at 850.

16          Not only does the Insurance Code expressly authorize enforcement exclusively by the

17   Commissioner, nothing in its legislative history suggests the Legislature intended otherwise. For

18   instance, California's Office of Senate Floor Analyses ("OSFA") digest of § 11658 (the

19   "Legislative Digest") states that the legislature's purpose was to "provide clear standards under

20   which the Insurance Commissioner could order the use of forms be discontinued. . . ." CA B. An.,

21   A.B. 1753 Sen., 8/31/1995, at 3. The Legislative Digest does not discuss any private right to

22   enforce § 11658; indeed, every mention of enforcement of the statute concerns the Commissioner,

23   not private litigants. *See*, *e.g.*, *id.* at 2 ("[T]his bill revises procedures affecting the prior approval

24   of workers' compensation insurance policy forms by the . . . Commissioner."); *id.* ("It would be

25   unlawful to use any form or endorsement that is found by the [C]ommissioner to be unlawful.").

26          Neither the plain language of § 11658 nor its legislative history suggests that the

27   California "Legislature has . . . manifested an intent to create . . . a private cause of action" in

28   these provisions. *Moradi-Shalal*, 46 Cal. 3d at 305 (finding no private right to sue under

DLA PIPER LLP (US)
SAN FRANCISCO

-26-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1   Insurance Code § 790.03 based, in part, on findings in OSFA Legislative Digest). Pet Food thus

2   cannot meet its "heavy, perhaps insurmountable, burden of persuasion" to demonstrate that such a

3   private right action exists. *See Crusader*, 54 Cal. App. 4th at 133.

4         With no private right of enforcement, Pet Food's attempt to enforce these Insurance Code

5   provisions and related regulations as "unjust enrichment" must fail.

6   /////

7   **IV.   CONCLUSION**

8         Pet Food cannot adduce evidence that it suffered economic harm "as a result of" any

9   alleged conduct on the part of Defendants because no such evidence exists. Indeed, to the

10   contrary, the evidence demonstrates the lack of any such harm or causation. Pet Food's inability

11   to substantiate these essential elements of its UCL and quasi-contract causes of action is fatal to

12   those claims. Where a plaintiff "fails to make a showing sufficient to establish the existence of an

13   element essential to that party's case, and on which that party will bear the burden of proof at

14   trial … there can be 'no genuine issue as to any material fact,' since a complete failure of proof

15   concerning an essential element of the nonmoving party's case necessarily renders all other facts

16   immaterial. The moving party is 'entitled to a judgment as a matter of law' because the

17   nonmoving party has failed to make a sufficient showing on an essential element of her case with

18   respect to which she has the burden of proof." *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ.

19   P. 56). That is precisely the case here, and Applied is "entitled to judgment as a matter of law."

20   The Court should grant the Motion.

21

22   Dated: July 26, 2019                     Respectfully submitted,

23                                            **DLA PIPER LLP (US)**

24   By:   */s/ Shand S. Stephens*
25         SHAND S. STEPHENS
             AMANDA L. MORGAN
26           JEANETTE T. BARZELAY
             555 Mission Street, Suite 2400
27           San Francisco, California 94105
             Tel: (415) 836-2500
28           Fax: (415) 836-2501

DLA PIPER LLP (US)
SAN FRANCISCO

-27-
POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC

1

2          **HINSHAW & CULBERTSON LLP**

3          TRAVIS WALL
           One California Street, 18th Floor
4          San Francisco, California 94111
           Tel: (415) 362-6000
5          Fax: (415) 834-9070

6          SPENCER Y. KOOK
           633 West 5th Street, 47th Floor
7          Los Angeles, California 90071
           Tel: (213) 680-2800
8          Fax: (213) 614-7399

9

10         ATTORNEYS FOR DEFENDANTS
           APPLIED UNDERWRITERS, INC., APPLIED
11         UNDERWRITERS CAPTIVE RISK ASSURANCE
           COMPANY, INC., CALIFORNIA INSURANCE
12         COMPANY, AND APPLIED RISK SERVICES,
           INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

-28-

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 2:16-CV-00158-WBC AC; 2:16-01211 WBS AC
WEST/287163492