UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| PET FOOD EXPRESS, LTD., | No. 2:16-CV-01211 WBS AC |
| Plaintiff, | |
| v. | |
| APPLIED UNDERWRITERS, INC., APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC., CALIFORNIA INSURANCE COMPANY, and APPLIED RISK SERVICES, | MEMORANDUM AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT |
| Defendant. | |

----oo0oo----

Plaintiff Pet Food Express, Ltd. ("Pet Food") filed this lawsuit against defendant Applied Underwriters, Inc. ("Applied Underwriters"), Applied Underwriters Captive Risk Assurance Company, Inc. ("Captive Risk Assurance"), and California Insurance Company ("California Insurance") (collectively, "Applied"), alleging that defendants unlawfully marketed and sold workers' compensation insurance to California employers in violation of California's Unfair Competition Law.

1

Before the court is Defendants' Motion for Summary Judgment, (Defs.' Mot. for Summ. J. ("DMSJ") (Docket No. 139)), and plaintiff's Motion for Partial Summary Judgment, (Pl.'s Mot. for Partial Summ. J. ("PMSJ") (Docket No. 138-1)).

I. Factual and Procedural Background

California requires that all employers purchase workers' compensation insurance to cover employees' work-related injuries. Cal. Lab. Code § 3700. The state also requires that all workers' compensation insurance policy forms, rates, and rating plans be filed for approval with the California Workers Compensation Insurance Rating Bureau ("the Bureau") and approved by the California Department of Insurance ("CDI"). (Pl.'s First Am. Compl. ("PFAC") ¶ 3 (Docket No. 54); see also Cal. Ins. Code §§ 11658, 11735.)

Defendants filed a workers' compensation insurance program known as EquityComp ("Program") with the Bureau and received approval from the Department of Insurance. (PFAC ¶ 31.) Defendants thereafter marketed and sold the Program to plaintiff. (PFAC ¶ 30.) After the Program's policies took effect for the plaintiff, defendants required the plaintiff to enter a Reinsurance Participation Agreement ("RPA"). (PFAC ¶¶ 29, 44; DMSJ at 4.) Importantly, the parties agree that the RPA is "not a filed retrospective rating plan." (Pl.'s Reply in Opp. to Defs.' Mot. for Summ. J. ("PRSJ") at 4, ¶ 17.)

Captive Risk Assurance is structured as a segregated cell reinsurance facility. (PRSJ at 3, ¶7.) Under this structure, instead of pooling its risk, each Program participant has a separate underwriting account (or "cell"). (PRSJ at 3, ¶

7.) Under the RPA, the employer agrees to maintain a capital account in its segregated cell. (PRSJ at 3, ¶8.) Each Program participant also agrees to maintain reserves in its cell after the RPA's three-year active term expires. (PRSJ at 4, ¶11.) The reserve amount is adjusted periodically as claims develop. (DMSJ at 4.) Because the ultimate claims costs cannot be known in advance, "loss development factors" or "LDF's" (i.e., multipliers) are applied to claims to estimate their final cost. (PRSJ at 3, ¶ 9.) LDFs reduce over time until their effect on the cost (and therefore the amount in the cell) reaches zero and the cell is closed. (DMSJ at 4.) When the segregated cell is closed, the employer's ultimate cost is calculated using the RPA's formulas and, depending on the claims experience, the employer could receive a profit sharing distribution under the RPA, also called a "rebate." (PRSJ at 4, ¶ 14.) Under the RPA, Applied may, "in its sole discretion," hold the money in the cell account up to "7 years after the expiration of the policies." (PMSJ at 14.)

On June 20, 2016, in an administrative action challenging Applied's RPA, the California Insurance Commissioner ("Commissioner") issued a Decision and Order, holding that the RPA must be filed and approved by the Commissioner pursuant to Insurance Code § 11735. See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc., 2:16-158 WBS AC, 2016 WL 6094446, at *5 (E.D. Cal. Oct. 17, 2016). Because defendants did not file the RPA before it took effect, the Commissioner found that the "RPA is void as a matter of law." Id. at *2.

In the wake of that administrative proceeding,

defendants developed an agreement that could be sold and marketed with the CDI's approval. (DMSJ at 5.) While there are differences between the unfiled and the filed RPAs, "none of them changes the structure, material terms, or financial results to the participant." (Fein Decl., Defs.' Mot. for Summ. J., Medlong Decl. Ex. 5 (Docket No. 139-6).)

Pet Food filed a class action complaint against defendants asserting claims for unfair competition, rescission, declaratory relief, and fraud. On June 21, 2017, plaintiff filed an amended complaint asserting additional claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962; under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and for quasi-contract. Defendants in turn filed a counterclaim to plaintiff's amended complaint alleging breach of contract. (Defs.' Answer, Countercl., at 30, ¶ 24 (Docket No. 76).)

Defendants subsequently moved to dismiss the amended complaint. (Docket No. 61.) The court dismissed the RICO claims and denied the motion to dismiss in all other respects. (Mem. and Order Re: Defs.' Mot. to Dismiss at 24 (Docket No. 65).) With respect to plaintiff's UCL claim based on Insurance Code § 11735, the court found that an unfiled rate is not unlawful per se and determined that the Commissioner did not conduct the requisite formal rate disapproval hearing. (Id. at 20-22.) Plaintiff then moved to certify the class. (Docket No. 116.) This court subsequently denied the motion to certify on superiority grounds. (Id.)

The claims remaining are Pet Food's UCL claims for

unfair competition and unjust enrichment, and defendant's counterclaim for breach of contract. Plaintiff relies on the Commissioner's administrative decision and two subsequent California Courts of Appeal cases to argue that the RPA is an illegal program. (PMSJ at 5.) According to plaintiff, defendant's sale of this allegedly illegal program violates UCL Section 17200. (PMSJ at 3.) Pet Food seeks restitution in "the amount of money left in its segregated cell" account. (Mem. in Supp. of Mot. Partial Summ. J. at 2 (Docket No. 138-1).) This money consists of funds that Pet Food "has paid Defendants for the EquityComp plans." (Witriol Decl., Decl. of Terri Witriol Lim in Opp. to Defs.' Mot. for Summ. J., at 2 (Docket No. 141-1).) Plaintiff also seeks a return on investment of these funds. Id. In contrast, defendants seek to enforce California Insurance's contract with Pet Food and allege that Pet Food remains liable for premiums, taxes, and assessments under the purchased policies. (Defs.' Answer, Countercl., at 30, ¶ 24 (Docket No. 76).)

Defendants now seek summary judgment under Federal Rule of Civil Procedure 56, on the grounds that plaintiff lacks standing to sue under the UCL. (DMSJ at 16.) Plaintiff seeks partial summary judgment on the grounds that (1) the unfair competition claim is valid as a matter of law because the RPA is illegal; (2) defendants are collaterally estopped from litigating that illegality; (3) plaintiff is entitled to restitution as a matter of law; (4) the restitution must include a return on investment on those funds; and (5) no contract exists between California Insurance and Pet Food. (PMSJ at 1-2.)

5

II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id. Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

III. Defendants' Motion for Summary Judgment

    A. Standing to Sue Under the UCL

California's Unfair Competition Law ("UCL") protects consumers and competitors from unfair competition, defined broadly to include "any unlawful, unfair or fraudulent business act or practice." (Cal. Bus. & Prof. Code § 17200.) Pet Food proceeds in this case under only the "unlawful" prong of the

statute. (Pl.'s Mem. in Opp. to Summ. J. at 3 (Docket No 141).) "By proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the [UCL] makes independently actionable." Hale v. Sharp Healthcare, 183 Cal. App. 4th 1373, 1382-83 (4th Dist. 2010) (citing Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 180 (1999)). The UCL initially permitted "any person acting for the interests of itself, its members or the general public" to bring a private suit. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 321 (2011). In 2004, voters approved Proposition 64 (Gen. Elec. (Nov. 2, 2004)), which amended the UCL to grant standing to assert a claim only to certain public officials and to private plaintiffs who can demonstrate that he or she "has suffered injury in fact" and "has lost money or property as a result of" the unfair competition alleged. Hall v. Time Inc., 158 Cal. App. 4th 847, 852 (4th Dist. 2008).

          1.    Injury in Fact

The "injury in fact" language in Proposition 64 incorporates the federal meaning of the phrase. Kwikset, 51 Cal. 4th at 322; Prop.64, §1, subd. (e) (requiring injury in fact "under the standing requirements of the United States Constitution"). Under federal law, a plaintiff satisfies the injury-in-fact requirement where he or she has suffered a "distinct and palpable injury" or "[a]n actual or imminent invasion of a legally protected interest, in contrast to an invasion that is conjectural or hypothetical." Hall, 158 Cal App. 4th at 853 (citing Black's Law Dict. 801 (8th ed. 2004)).

7

Loss of money or property, as required under Proposition 64, is one of many injuries that can satisfy the injury-in-fact requirement. Kwikset, 51 Cal 4th at 324. Courts therefore consider the "substantially narrower" Proposition 64 loss requirement in conjunction with the injury-in-fact requirement. Id. at 324. To establish standing to sue under the UCL, a plaintiff must: "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice alleged." Id. at 323.

2. Loss of Money or Property

To establish standing, Proposition 64 requires a plaintiff to show that it "lost money or property." Hall, 158 Cal. App. 4th at 852. "The plain import of this is that a plaintiff now must demonstrate some form of economic injury." Kwikset, 51 Cal 4th at 323. For purposes of UCL standing, a loss is "[a]n undesirable outcome of a risk; the disappearance or diminution of value, [usually] in an unexpected or relatively unpredictable way." Hall, 158 Cal. App. 4th at 853 (citing Black's Law Dict. 963 (8th ed. 2004)). A purchase or transaction where the person paid with money, without more, does not constitute a loss. Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1592 (4th Dist. 2008).

The undisputed facts here are insufficient to find an economic loss because Pet Food has failed to show that the price or quality of the insurance coverage differed from the expectations Pet Food held when entering the contract. In this

8

line of cases, courts consistently refuse to find economic loss where plaintiffs did not allege that "they could have bought the same insurance for a lower price" or that "they were dissatisfied with the insurance or were uninformed of its price." See Peterson, 164 Cal. App. 4th at 1591-92; see, e.g., Hall, 158 Cal. App. 4th at 855 (finding no injury where plaintiffs did not allege that they "did not want the [product], the [product] was unsatisfactory, or the [product] was worth less than what the plaintiff paid for it."); Medina v. Safe-Guard Prods., Int'l., Inc., 164 Cal. App. 4th 105, 114 (4th Dist. 2008) (finding no injury where plaintiff "has not alleged that he didn't want [insurance] coverage in the first place, or that he was given unsatisfactory service or has had a claim denied, or that he paid more for coverage than it was worth"); Demeter v. Taxi Comp. Servs., Inc., 21 Cal. App. 5th 903, 916-17 (2d Dist. 2018) (finding no injury where plaintiff did not show "that the service he purchased . . . was somehow not up to par" or that "the amount he paid for his . . . membership was more than it was worth"); Gaines v. Home Loan Ctr., Inc., No. SACV08667JSTRNBX, 2011 WL 13182970, at *5 (C.D. Cal. Dec. 22, 2011) (finding no injury where plaintiff could not "explain what Plaintiff expected to receive but did not from the . . . transaction").

   Here, Pet Food does not allege, nor do the undisputed facts suggest, that Pet Food was dissatisfied with either the price or the coverage. With respect to the price, Pet Food has not shown that it could have obtained the same insurance at a lower price. To the contrary, Pet Food admitted that it could not be part of a proposed revised class of allegedly injured

9

Program participants because it did not pay more than the guaranteed cost policy premiums (i.e., the premiums that do not vary as claims come in). (Pl's. Positions Re Renewed Mot. for Cl. Cert. at 3:13-15 (Docket No. 126-1) ("[O]nly those employers who paid **more** than the [guaranteed cost] policy premiums would be putative class members. As a result, Alpha would be a class member . . ., while . . . [Pet Food] would not.").) Indeed, Pet Food's initial concern about the Program was that the Program should be cheaper "despite the fact that it was saving money" compared to other programs. (Decl. Terrance Lim, Ex. 3 at 249:9-10 (Docket No. 139-6)). Because Pet Food has not disputed this allegation, this court can infer that Pet Food could not have paid less for the same insurance elsewhere.

Pet Food also cannot establish a loss with respect to Applied's policy because Pet Food received "the bargained for insurance at the bargained for price." Cf. Peterson, 164 Cal. App. 4th at 1591. Pet Food does not allege that the coverage was subpar. Pet Food also has not alleged that the price of the policy -- Pet Food's total payment minus the amount Applied is eventually required to return to Pet Food (i.e., the "rebate") -- was not what Pet Food anticipated. Indeed, by the time Pet Food renewed the policy, plaintiff had "a clear understanding" of the parameters and the maximum cost under the policy (Decl. Terrance Lim, Ex. 3 at 249:9-10 (Docket No. 139-6)). Pet Food therefore had enough information to dispute the price but did not. Cf. Peterson, 164 Cal. App. 4th at 1591-92 (considering lack of pricing information as a source of loss).

Pet Food's only allegation of loss is the money

currently sitting in the segregated cell account. This amount, however, is not a loss because Pet Food fully expected not to possess this money today. The mere parting with the possession of money for a period of time does not constitute a loss. Peterson, 164 Cal. App. 4th at 1592 (rejecting the view that a person has lost money merely because the money is "no longer in their possession") (citing Hall, 158 Cal. App. 4th at 853).

Further, under the UCL, the diminution of value must be unexpected or unpredictable to constitute a loss. Id. (citing Hall, 158 Cal. App. 4th at 853). Under the terms of the agreement, Applied's retention of the money in the account was not unexpected. The parties agree that, under the Program, Pet Food was to maintain a capital account in its segregated cell. (Pl.'s Reply to Separate Statement in Opp. to Defs.' Mot. for Summ. J. at 3, ¶8 (Docket No. 141-2).) Pet Food also does not dispute that the RPA permits Applied, "in its sole discretion," to hold the money "3 years after all claims have closed or 7 years after the expiration of the policies." (Pl's Mot. for Partial Summ. J. at 14 (Docket No. 138-1).) Based on the express terms of the contract, Pet Food should have expected not to see the money in the segregated cell account until 2023 at the latest -- seven years after the policy was to expire.[1]

The parties' understanding of the agreement confirms this expectation. According to Ms. Terri Witriol, Pet Food's Chief Financial Officer, "money overpaid" by Pet Food had to remain in the account "according to the agreement." (Decl. of

---

[1] The 2012-2015 policy expired on October 1, 2016. (Pl's Mot. for Partial Summ. J. at 14 (Docket No. 138-1).)

11

Terri Witriol Lim in Opp. to Defs.' Mot. For Summ. J., at 2 (Docket No. 141-1).) Indeed, Mr. Terrance Lim, Pet Food's Chief Executive Officer, knew by 2014 that the Program would take long to grant the rebate. (Decl. Terrance Lim, Ex. 3 at 270 (Docket No. 139-6)). But in 2015, Pet Food chose to renew the agreement regardless because it was Pet Food's "best option at the time." (Id. at 309.)

Pet Food has not established "what Plaintiff expected to receive but did not from the . . . transaction." Cf. Gaines v. Home Loan Ctr., Inc., No. SACV08667JSTRNBX, 2011 WL 13182970, at *5 (C.D. Cal. Dec. 22, 2011). The transaction conformed to Pet Food's expectations from the beginning because Pet Food could not have obtained the policy for a lower price elsewhere, did not have issues with the coverage, and did not make payments it did not expect to make when Pet Food entered into the contract. Cf. Peterson, 164 Cal. App. 4th at 1591-92. Plaintiff therefore "got exactly what he bargained for" and did not incur an economic loss. Cf. Baggett v. Hewlett-Packard Co., No. SACV070667AGRNBX, 2009 WL 3178066, at *3 (C.D. Cal. Sept. 29, 2009).

### 3. Illegality as an Injury Per Se

Proposition 64 imposed "additional requirements on plaintiffs beyond merely having suffered an 'unlawful, unfair or fraudulent business act or practice.'" Medina, 164 Cal. App. 4th at 115. Plaintiffs must show that they also "lost money or property as a result of the act or practice." Id.

The Ninth Circuit, albeit in an unpublished memorandum decision, has held that the purchase of goods that a defendant "is legally not allowed to sell in the form being offered" alone

may constitute both an unlawful practice and a loss for purposes of UCL standing. Franz v. Beiersdorf, Inc., 745 F. App'x 47, 48-49 (9th Cir. 2018) (e.g., unapproved drugs). By contrast, cases involving "voidable service contracts" do not give rise to the same inference of loss. Id.

Although the Franz court did not say much more, the court's distinction between the cases that merit an inference of loss, and those that do not, still relies on the plaintiff's expectations, and the plaintiff's allegations regarding the value and the price of the product. In Franz, the court found that the unlawful purchase of a drug lacking FDA approval constituted a loss under the UCL. The court relied only on Medrazo v. Honda of North Hollywood. 205 Cal. App. 4th 1 (2d Dist. 2012). In Medrazo, defendant sold plaintiffs a motorcycle without a legally required label that disclosed the amount charged above the suggested retail price, the cost for the assembly, and the cost of optional accessories included in the price, among other costs. Id. at 23. Because plaintiffs did not have the pricing information label, they overpaid for the motorcycle. Id. The court thus found economic loss because the plaintiffs paid more than they would have paid had defendant complied with the law. Similarly, because the illegal product in Franz "should not have been in the market" in any form, 745 F. App'x at 48, any payment is more than plaintiff would have paid had defendant complied with the law. This is true for all illegal products. So it follows that any payment for such a product constitutes an economic loss.

In contrast, when the product or service sold is legal,

but the contract is flawed, the purchaser does not automatically satisfy the economic loss requirement because the court cannot infer that the plaintiff would have paid less had the defendant complied with the law. Because the product can legally exist in the market, enforcing the contract may still convey the value the parties intended it to convey at a legally fair price. Cf. Medina, 164 Cal. App. 4th at 114 (placing the burden on plaintiff to allege a lower value where insurance seller was unlicensed); Peterson, 164 Cal. App. 4th at 1591 (same). In such a case, the burden to prove a loss falls on the plaintiff. Id.

The Franz court's inference that the purchase of an illegal product constitutes a loss therefore applies only when the underlying product sold is illegal. For its proposition that voidable service contracts do not necessarily result in an economic loss, the court cited Medina v. Safe-Guard Products, 164 Cal. App. 4th 105 (4th Dist. 2008), and Demeter v. Taxi Computer Services, 21 Cal. App. 5th 903 (2d Dist. 2018). Both of these cases are instructive here. In Medina, the defendant, an insurer, was not licensed to sell insurance, did not file its contracts with the Insurance Commissioner, and did not insure its contracts obligations. "In short, [defendant] was not a licensed insurer." Medina, 164 Cal. App. 4th at 113. The court first found that the object of the "illegal contract" -- the provision of insurance coverage -- was lawful. Id. at 110-112. The court then found that plaintiff did not incur an economic loss because plaintiff did not allege dissatisfaction with the coverage or the price of the policy. Id. at 114. Because the product sold was not illegal, plaintiff bore the burden of establishing loss.

14

The court in Demeter arrived at the same result. In Demeter, defendant provided talent listing services without procuring the bond California's talent services law requires. As in Medina, the court first found that the defendant's services were not an "illegal operation" despite the defendant's noncompliance with the law. Demeter, 21 Cal. App. 5th at 913. The court subsequently found no economic loss because plaintiff did not show "that the service he purchased . . . was somehow not up to par" or that "the amount he paid for his . . . membership was more than it was worth." Id. at 916-917. Again, because the services sold could exist in the market legally, the plaintiff was required to allege dissatisfaction with the service or the price.

Here, Pet Food argues that because the RPA was an allegedly illegal contract, any payment of the RPA ought to constitute an economic loss. But whether a contract is illegal or voidable is a different question from whether the subject matter of the agreement is illegal. See Medina, 164 Cal. App. 4th at 110-112 (distinguishing the "object" of the contract from the legality of the contract).

Pet Food's participation in the RPA alone does not establish a loss because the subject matter of the agreement -- insurance coverage through a captive reinsurance cell -- is not illegal. Applied has provided undisputed expert testimony to show that the differences between the unfiled RPA and the approved RPA are immaterial, as they do not "change[] the structure, material terms, or financial results to the participant." (Fein Decl., Defs.' Mot. for Summ. J., Medlong

15

Decl. Ex. 5 (Docket No. 139-6).) Pet Food has not provided any evidence to the contrary. The undisputed facts thus establish that, even if the sale of the RPA was illegal, the contents of the agreement were not.

Moreover, the unfiled status of the RPA does not make the rate unlawful per se. The Commissioner's order in the administrative appeal found that the RPA between the parties was void and unenforceable because it was not filed with the Bureau. In the Matter of the Appeal of Shasta Linen Supply, Inc., Decision of the California Department of Insurance, File AHB-WCA-14-31 (hereinafter "Order"). This court thereafter ruled that the Order "does not control this court" and declared its disagreement with the Commissioner, holding instead that "an unfiled rate is not unlawful per se." Shasta Linen, 2016 WL 6094446, at *5 (citing Dyna-Med, Inc. v. Fair Emp't & Hous. Com., 43 Cal. 3d 1379, 1388 (1987)).

Plaintiffs now offer two California Courts of Appeal cases to prove the illegality of the arrangement, Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co., 30 Cal. App. 5th 970 (1st Dist. 2018), and Nielsen Contracting, Inc. v. Applied Underwriters, Inc., 22 Cal. App. 5th 1096 (4th Dist. 2018). Neither case is applicable here. The Luxor court decided only that the delegation clause and the arbitration provision in the RPA are void. The Nielsen court likewise analyzed only the dispute resolution provisions of the RPA. Neither court determined that the rate was unlawful as a result of it not being filed. More importantly, neither court foreclosed the possibility of Applied selling the RPA legally (i.e., a filed and

16

approved version of the RPA).

Even if the cases did stand for the proposition that the RPA is illegal in its totality, the contract is not necessarily void because "the effect of the illegality depends on the facts and equities of the particular case." See Johnson v. Johnson, 192 Cal. App. 3d 551, 558 (2d Dist. 1987). In Medina, the court opined that "holding an insurance contract void because the insurer was not licensed is about the worst possible remedy for the illegality of the insurer's unlicensed status," 164 Cal. App. 4th at 111, and the same logic applies here. "[I]nsurance contracts are legally unique." Id. After risks have materialized and claims have been filed, "[a] policyholder . . . cannot, by definition, obtain a substitute [policy] in the marketplace." Id. Finding an insurance policy to be void would result in the consumer bearing the entirety of the loss, so "in the insurance context, not to enforce the contract would be to reward the violation of the law." Id. at 112.

Absent allegations that the object of the contract -- insurance coverage through a captive reinsurance cell -- is illegal, the court can "preserve[] and enforce[] any lawful portion of a parties' contract that feasibly may be severed." Medina, 164 Cal. App. 4th at 112. In Medina, "where the only taint of illegality was the unlicensed status of the insurer itself," the court found the contract valid as to the lawful object of the contract: insurance coverage. Id. Just as in Medina, the only basis for the allegations of the illegality of the RPA is Applied's failure to file the agreement with the Bureau. The alleged illegality of the contract does not taint

17

the lawful object of the contract, so even if the RPA is void and unlawful, the service it provides is not.

Because the underlying service of the RPA is not illegal, Pet Food's transaction under the RPA is not an economic loss per se. Pet Food therefore bears the burden of showing economic loss through dissatisfaction with the service or the price. As discussed above, Pet Food has done neither. Pet Food has not offered any other theory of loss and therefore lacks standing to sue under the UCL.[2] Accordingly, the court will grant summary judgment to defendants.

VI. Plaintiff's Motion for Partial Summary Judgment

Having determined that the RPA is not illegal as a matter of law, the issues remaining under Plaintiff's Motion for Partial Summary judgment are (1) whether plaintiff is entitled to restitution, (2) whether plaintiff is entitled to a return on investment of the funds in the segregated cell account, and (3) whether a contract exists between Pet Food and California Insurance. Because Pet Food does not have standing to sue under the UCL, the court need not determine at this time whether restitution and a return on investment are the appropriate remedies for the alleged UCL violation. Further, Applied pleaded the breach of contract claim in the alternative, should the RPA be deemed void or unenforceable. (Defs.' Answer, Countercl., at 30, ¶ 23 (Docket No. 76).) Because the RPA is not void, the court also need not decide whether a contract exists between Pet

---

[2] Because, as a matter of law, Pet Food did not lose money or property under the UCL, the court need not decide the causation prong of the standing test.

```
1  Food and California Insurance.
2          IT IS THEREFORE ORDERED that defendants' Motion for
3  Summary Judgment (Docket No. 139) be, and the same hereby is,
4  GRANTED.
5          IT IS FURTHER ORDERED that plaintiff's Motion for
6  Partial Summary Judgment (Docket No. 138) be, and the same hereby
7  is, DENIED.
8  Dated:   September 11, 2019
                                    WILLIAM B. SHUBB
9                                   UNITED STATES DISTRICT JUDGE
```